David H. ORTH and Barbara A. Orth, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 86–1546.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1986.

Decided March 9, 1987.

Michael A. Sandberg, Kamensky & Rubinstein, Lincolnwood, Ill., for petitioners-appellants.

Elaine F. Ferris, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before BAUER, Chief Judge, WOOD, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This is an appeal from the tax court's decision affirming the Commissioner's deficiency determination against the taxpayers, David H. Orth and Barbara A. Orth. The taxpayers donated 73 lithographs to various charitable organizations, and claimed a charitable contribution deduction in the amount of $300 per lithograph, the price for which similar lithographs allegedly were sold in galleries or from art dealers. The Commissioner valued the lithographs using the price which the Orths and others paid when buying the lithographs in bulk from wholesalers. The taxpayers argued that the Commissioner undervalued their deduction. The tax court found that the Commissioner's valuation was correct, and the taxpayers appeal.

## I. FACTUAL BACKGROUND

The tax court made the following findings of fact. (For additional findings of fact, see *Lio v. Commissioner*, 85 T.C. 56 (1985).) This court must accept the tax court's findings unless they are clearly erroneous. *Illinois Power Co. v. Commissioner*, 792 F.2d 683, 685 (7th Cir.1986).

Taxpayer David H. Orth, a physician, is married to taxpayer Barbara A. Orth. In September of 1978, the taxpayers paid $10,-

000 to purchase 100 unframed lithographs created by artist Leonardo Nierman.[1]

A lithograph is a piece of paper on which an image is artistically reproduced. The image is produced by pressing the paper onto a hard object known as a plate, which has part of its surface covered with ink. A plate is used to create multiple impressions of the same image, and the plate is then destroyed or cancelled. Editions generally are limited in number.

Lithographs usually are sold to the public by art galleries and art dealers. While more lithographs are sold framed it is not uncommon for the public to purchase unframed lithographs from galleries and dealers.

A "suite" is a term used in the retail art trade for a set of works, usually by the same artist and often on the same theme or subject matter, compiled and offered together as a set. A single suite of "Intuition de L'Univers" consists of ten lithographs, and a double suite of "Intuition de L'Univers" consists of twenty lithographs. Leonardo Nierman created 271 "Intuition de L'Univers" suites: 101 double suites and 170 single suites, for a total of 3,720 lithographs.

The taxpayers purchased the lithographs from Greenwich Art Consultants, Inc. (Greenwich), a joint venture between Art Consultants, Ltd. (Art Consultants) and Preferred Partnerships, Inc., formed for the limited purpose of selling lithographs from Nierman's "Sound of Color" and "Intuition de L'Univers" editions.

Art Consultants was a subchapter S corporation whose business consisted of selling graphics. Almost all of these graphics were sold unframed to individuals. Art Consultants did not have a public area for display of art. It used an office which was rented by the law firm of Kamensky and Rubinstein, the firm which represented the taxpayers in this appeal, to store art and maintain its books and records. Greenwich used the facilities and personnel of Art Consultants.

As part of a package of art and services, Art Consultants provided the following tax-related services to Dr. Orth: letters from the organizations to which he contributed lithographs acknowledging their receipt; appraisals of the 73 lithographs, one by R. Bruce Duncan, president of the Chicago Appraisers Association, who appraised them at $24,000, the other by Ross Edman, a Chicago appraiser, who appraised the lithographs at $25,464[2]; and photographs of the lithographs.

Lublin Graphics, Inc. (Lublin), was the sole United States distributor of Nierman lithographs. During 1978 and 1979, Lublin sold a total of 2,319 Nierman lithographs; Greenwich purchased approximately 63% (1,473) of these lithographs for $50 each. All of the Nierman lithographs that Greenwich purchased were from either the "Sound of Color" or the "Intuition de L'Univers." Greenwich sold almost all of these Nierman lithographs in 1978 and January, 1979, for $100 each in large quantities to individuals.

In 1979, galleries sold an unspecified number of single lithographs from the "Sound of Color" and the "Intuition de L'Univers" editions for approximately $300, unframed. Lithographs from the

---

**1.** The Orths purchased the following lithographs:

    (a) One single suite entitled "Intuition de L'Univers" Suite # 123.

    (b) Three double suites entitled "Intuition de L'Univers" Suites # XV/LXXV, XVIII/LXXV and XLV/LXXV.

    (c) One suite entitled "Sound of Color" Suite # XVI/LXXX.

    (d) Four Mahler lithographs # 151, 152, 153, and 154/250.

    (e) One Brahms lithograph # 176/250.

    (f) Four Debussy lithographs # 149, 150, 151, and 152/250.

    (g) Four Bach lithographs # 150, 151, 152, and 153/250.

    (h) Four Mozart lithographs # 156, 157, 158, and 159/250.

    (i) Two Ravel lithographs # 138 and 139/250.

    (j) Four Stravinsky lithographs # 197, 198, 199, and 200/250.

**2.** Taxpayers do not argue in their brief that these appraisals were determinative of value; even if they did so argue, the tax court was not bound to accept these appraisals when other evidence of value was available. *See, e.g., Tripp v. Commissioner,* 337 F.2d 432, 434 (7th Cir. 1964).

"Sound of Color" edition are still available for sale in some galleries.

Taxpayers insured the lithographs on March 30, 1979, for $300 per lithograph.

In December of 1979, the taxpayers, having owned the Nierman lithographs longer than the period required by Treasury regulations in order to deduct the full market value of a charitable contribution,[3] donated 73 lithographs to several charitable organizations, including Mundelein High School (7 lithographs), Waukegan Public Schools (5 lithographs), Thornton Fractional High School (20 lithographs), Chicago Public Library (5 lithographs), Chicago Board of Education (6 lithographs), The Woodlawn Organization (10 lithographs), and Deerfield Public Schools (20 lithographs). The taxpayers framed and displayed nine of the Nierman lithographs in Dr. Orth's office, and placed the remaining eighteen lithographs in storage.

On their federal income tax return for calendar year 1979, Dr. and Mrs. Orth claimed a charitable contribution deduction of $27,682 (approximately $379 each) for the donation of the 73 Nierman lithographs to qualified charitable organizations.[4] It is unclear how the taxpayers derived the $27,682 figure; they argued before the tax court and on appeal, however, that the lithographs had a total fair market value of $21,900 ($300 each) as of the date of donation.

In the deficiency notice, the Commissioner disallowed the claimed deduction to the extent it exceeded $7,300, the cost of the lithographs to the taxpayers. The tax court found that the taxpayers had failed to meet their burden of proving that the value of the 73 Nierman lithographs which they donated was greater than their cost and affirmed the Commissioner. Taxpayers appeal that decision.

## II.  DISCUSSION

The taxpayers raise two challenges on appeal. They assert (1) that the tax court's finding on the lithographs' value and the market it used in determining that value was contrary to the parties' stipulations, and (2) that the tax court improperly used the date of taxpayers' acquisition of the lithographs rather than the date of donation to determine the lithographs' value.

### A.  *Stipulations*

The parties stipulated that several statements were true. Among these stipulations were the following:

19. In 1979 galleries sold single lithographs from the "Sound of Color" and the "Intuition de L'Univers" editions for approximately $300, unframed. Without describing the sales by Greenwich Art Consultants as retail, wholesale or anything else, the parties describe these as retail sales. Lithographs from the "Sound of Color" edition are still available for sale in some galleries.

. . . .

21. Lithographs are usually sold to the public by art galleries and art dealers. Galleries and dealers sell lithographs both framed and unframed. While more lithographs are sold framed, it is not uncommon for the public to purchase unframed lithographs from galleries and dealers. The foregoing general statements are true with respect to Nierman lithographs, including the editions at issue in this case.

. . . .

23. Greenwich Art Consultants sold almost all of the "Sound of Color" and the "Intuition de L'Univers" lithographs that it purchased from Lublin Graphics. The sales were all for $100 per lithograph. The sales took place in 1978 and January of 1979. . . .

In light of stipulations 19 and 21, the taxpayers argue that the fair market value established by the Commissioner and af-

---

3. See Treas.Reg. § 1.170A–4(b)(2) (as amended in 1982). During the years involved, the capital gains holding period was one year. I.R.C. § 1222(3) (1982).

4. The parties stipulated during the tax court proceedings that the seven organizations to which taxpayers donated the lithographs were qualified charitable organizations for purposes of I.R.C. § 170(a)(1).

firmed by the tax court, $100 per lithograph, is "utterly unsupportable." They argue that the appropriate market in which to determine the lithographs' value was the retail market of galleries and art dealers.

■ The Internal Revenue Code allows a taxpayer to deduct certain charitable contributions made within the taxable year. I.R.C. § 170(a)(1) (1982). The applicable treasury regulation provides that for a charitable contribution of property other than money "the amount of the contribution is the fair market value of the property at the time of the contribution." Treas. Reg. § 1.170A–1(c)(1) (as amended in 1984). Fair market value is defined as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas.Reg. § 1.170A–1(c)(2) (as amended in 1984); *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716–17, 36 L.Ed.2d 528 (1973); *Anselmo v. Commissioner,* 757 F.2d 1208, 1212 (11th Cir.1985). The Commissioner's determination of fair market value is presumed to be correct. *Helvering v. Taylor,* 293 U.S. 507, 514–15, 55 S.Ct. 287, 290–91, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Anselmo,* 757 F.2d at 1211. Tax court rules shift to the taxpayer the burden of proving that the valuation should have been higher than that stated in the deficiency notice. Tax Ct.R. 142(a).[5]

Neither § 170 of the Internal Revenue Code nor the treasury regulations thereunder specifies what market a taxpayer should use in calculating fair market value.

The tax court in its opinion referred to the definition of market provided by estate and gift tax regulations.[6] The Court of Appeals for the Eleventh Circuit has noted that

> [r]ules governing valuations for charitable contributions of property are distinguishable from valuations in the estate and gift context because the taxpayer has the opposite incentives in the two situations: the taxpayer wants to reduce the value of property for estate and gift tax purposes but, as here, the taxpayer wishes to inflate the value of property for charitable donation purposes.

*Anselmo,* 757 F.2d at 1214. The Eleventh Circuit in *Anselmo* went on to address these regulations as an accommodation to the taxpayers, however, because "[i]n the usual case ... there should be no distinction between the measure of fair market value for estate and gift tax and charitable contribution purposes." *Id.* The tax court similarly accommodated taxpayers in this case.

■ The Orths, focusing on the language in the treasury regulation requiring that the market be one in which the item "is most commonly sold," argue that the lithographs must be valued with reference to the retail market, that is, sales made by art dealers and galleries. They point to the stipulations that "[l]ithographs[, including Nierman lithographs,] are usually sold to the public by art galleries and art dealers," Stip. 21, and that "[i]n 1979 galleries sold single [Nierman] lithographs ... for approximately $300, unframed." Stip. 19. The combined effect of the stipulations, taxpayers assert, is to require the Commis-

5. This rule derives from the principle that deductions are a matter of legislative grace to which a taxpayer must clearly demonstrate his entitlement. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934); *Anselmo,* 757 F.2d at 1211 n. 2; *National Can Corp. v. United States,* 687 F.2d 1107, 1112 (7th Cir.1982).

6. The estate tax regulations provide as follows:
(b) *Valuation of property in general.*
... Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in

which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail....
Treas.Reg. § 20.2031–1(b) (as amended in 1965). The gift tax regulations are virtually identical in wording. *See* Treas.Reg. § 25.-2512–1 (as amended in 1965).

sioner, the tax court, and now this court to value the lithographs at $300 each as a matter of law.

The stipulations do not prove quite so much. Although it may be true that galleries and art dealers made more sales to individuals than Greenwich did, Greenwich sold more lithographs than the galleries and dealers. Lublin, the sole United States distributor of Nierman lithographs, sold 63% of its Nierman inventory to Greenwich, which in turn sold all of these lithographs in large quantities to individuals for $100 each. This indicates that the lithographs were in fact most commonly sold in the market through which the taxpayers acquired them, and the lithographs were most commonly sold at the price which taxpayers paid for them: $100 each. Although Greenwich may have had fewer sales than galleries and dealers, it sold more lithographs in the United States. The tax court's finding that the market in which lithographs were most commonly sold was the one in which the taxpayers bought their lithographs was not contrary to the stipulations.

## B. *Time of Valuation*

██ The fair market value of property as of a given date is a question of fact for the tax court to resolve considering all relevant evidence in the record. *Skripak v. Commissioner*, 84 T.C. 285, 320 (1985); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965). The tax court's finding on fair market value "must stand unless it is clearly erroneous." *Tripp v. Commissioner*, 337 F.2d 432, 434 (7th Cir.1964).

██ The tax court had before it only the parties' stipulations and two appraisals. The court is not required to accept an appraiser's opinion if it is contrary to the court's own judgment on value. *Chiu v. Commissioner*, 84 T.C. 722, 734 (1985). The court found insufficient evidence of the lithographs' value as of the date of donation; the court, therefore, calculated the value of the taxpayers' deduction based on the price the taxpayers paid for the lithographs. Taxpayers argue that the cost of the lithographs does not accurately

represent their fair market value fifteen months later, when the taxpayers donated them. The only evidence of the lithographs' value at the time of donation was the parties' stipulation that some consumer(s) paid $300 to buy lithographs from some gallery(ies). The taxpayers provided no evidence of the number of such sales, what types of customers were involved, or any other specific information. As the court noted, "[i]t is common knowledge that a consumer can pay a wide range of *retail* prices for the same item depending on where he chooses to shop and how much investigating he does of the various sources of a particular item." 85 T.C. at 69 (1985). The tax court, finding the stipulation to be too vague to be reliable as to the lithographs' value, instead relied on the record evidence that 63% of the Nierman lithographs sold in the United States in 1978 and 1979 were sold for $100.

The tax court in *Chiu* similarly relied on prices actually paid for the property rather than expert testimony which the court found to be unpersuasive. 84 T.C. at 734. And in *Skripak*, the court rejected expert opinion on value because the expert relied on an improper market in determining the value of the property at issue and failed to take into account the bulk of the sales. 84 T.C. at 322. Viewing the evidence in the record in the light most favorable to the market value finding, *Tripp v. Commissioner*, 337 F.2d at 435, we hold that the tax court was correct in its decision to rely on the price taxpayers paid for the lithographs rather than the vague stipulation that some people paid three times that amount. Nothing in the record indicates that the taxpayers received any kind of discount that was not generally available to other buyers. There was only a brief interval (15 months) between the time the taxpayers bought the lithographs and the time they donated them, and there is no evidence in the record of any significant appreciation in the lithographs' value during this interval. The tax court could reasonably have found that the lithographs' purchase price accurately reflected their value at the time the taxpayers donated them.

This was an interesting tax-saving arrangement devised as an art transaction, but the art will have to be treasured for art's sake and not as a tax deduction. Taxpayers' complaint was against the Commissioner, whereas perhaps it should have been against those who sold them the art if they are now dissatisfied with it as art or as a tax deduction.

Because the tax court's decision on the amount that taxpayers were entitled to deduct for their charitable contribution is not clearly erroneous, we affirm.

AFFIRMED.