**Arnold SALTZMAN and Joan R. Saltzman, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 85–CV–0841.

United States District Court, E.D. New York.

April 13, 1988.

---

Steven Mallis, and Barry Guberman, Graubard Moskovitz Dannett Horowitz & Mollen, New York City, for plaintiffs.

Thomas R. Jones, and Merrell B. Green, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

## CORRECTED FINDINGS OF FACT and CONCLUSIONS OF LAW [*]

KORMAN, District Judge.

At issue in this case, which was tried without a jury,[1] is the value of a gift made by plaintiff Arnold Saltzman to the Dance Collection of the New York Public Library in 1975. Jurisdiction is premised on 28 U.S.C. § 1346(a) (1982).

### I

In 1959 the Bolshoi Ballet appeared in the United States for its first American tour. Some of the critically acclaimed performances were filmed and the result was the creation of approximately thirty-five hours of videotape (the "Bolshoi films").[2] In 1965 excerpts from these tapes were shown on WABC in New York in two one and one-half hour installments on Sunday afternoons. *E.g.* Pl.Ex. 47. The programs, entitled "The Best of the Bolshoi," appar-ently were also shown in a number of other cities. *See* Pl.Ex. 48.

In 1971 plaintiff acquired the Bolshoi films when the assets of the Trans–Beacon Corporation ("Trans–Beacon") were liquidated. The Bolshoi films were part of a "grab bag" of film properties purchased from the bankrupt Trans–Beacon by a corporation controlled by plaintiff. The films were transferred to plaintiff shortly thereafter in exchange for 265,000 shares of Trans–Beacon stock. Pl.Ex. 53; T2 at 132–34.[3]

Genevieve Oswald, the curator of the Dance Collection at the New York Public Library ("the Library"), had been trying to obtain the Bolshoi films as a gift for at least eight years. *See* Def.Ex. K. In 1975, she finally succeeded in persuading plaintiff to donate them to the Library. Plaintiff then claimed a charitable deduction of $715,000 on his 1975 income tax return. *See* Pl.Ex. 4. The deduction was based on an expert appraisal prepared for tax purposes by Jac Venza, the Director of Performance Programming at WNET–Channel 13 in New York and executive producer of "Great Performances." Pl.Ex. 41(b). The Internal Revenue Service disallowed the $715,000 deduction and this action subsequently followed.

At trial, plaintiff elicited testimony to establish that he owned the copyright to the Bolshoi films and, thus, the capacity to exploit the films commercially without fear of litigation over their ownership. He also called a number of expert witnesses to substantiate his claim as to the commercial

---

[*] This corrected draft does not contain any substantive changes. Only editorial changes have been made in the draft of the Findings of Fact and Conclusions of Law that was originally filed.

**1.** There were five trial days. Citations to "T1" are to the transcript of proceedings on October 19, 1987; citations to "T2" refer to November 16; citations to "T3" refer to November 17; citations to "T4" refer to November 18; citations to "T5" refer to December 2.

**2.** There were also approximately 98 hours of film. *See* Pl.Ex. 36.

**3.** Plaintiff testified that at the time he purchased the "grab bag," he had no idea of the value of the film properties. T2 at 142–46; T4 at 143; T5 at 65. Indeed, the Bolshoi films were valued at zero in the bankruptcy proceedings. Def.Ex. B. at 7–8. Because he had "an affection" for the Bolshoi films, and because of legal problems associated with his corporation's acquisition of certain Trans–Beacon assets, plaintiff transferred the films to himself from his corporation for the Trans–Beacon stock. At the time of transaction the stock traded in the range of $\frac{1}{8}$ to $\frac{3}{8}$ per share. T2 at 133–34; Pl.Ex. 53. Although the other properties included in the "grab bag" were valued nominally, Def.Ex. B, plaintiff has realized substantial profits from the licensing of these properties. T2 at 142–46.

value, as well as the historical, cultural, educational and archival value (hereinafter "archival value"), of the Bolshoi films. The values placed on the films ranged from $715,000 to in excess of $3 million. *See also* Pl.Ex. 41a, 43b, 44a, 45a.

Defendant relied primarily on the testimony of expert witness A. Frank Reel to rebut plaintiff's evidence of the commercial value of the Bolshoi films.[4] Reel has a long history of association with television production and distribution as president of Metromedia Producers Corporation, a subsidiary of Metromedia, Inc., and as a former executive vice-president of United Artists. *See* Def.Ex. 1 at 16–17. While Reel believed that plaintiff did not possess the right to exploit commercially the Bolshoi films, he based his opinion of their commercial value on the assumption that plaintiff did possess such right. He concluded that the films had a net commercial value to plaintiff of between $7,500 and $15,000. T4 at 44–50; Def.Ex. I at 15.

## II

Section 170(a)(1) of the Internal Revenue Code provides that "[t]here shall be allowed as a deduction any charitable contribution ... payment of which is made within the taxable year." 26 U.S.C. § 170(a)(1) (1982). Where the charitable contribution consists of property other than money, "the amount of the contribution is the fair market value of the property at the time of the contribution."[5] Treas.Reg. § 1.170A–1(c)(1) (1988). Fair market value is defined as "the price at which the property would change hands between a willing

---

**4.** Paul Sawyer, who had valued the Bolshoi films at zero in conjunction with the bankruptcy proceeding of Trans–Beacon, *see* Def.Ex. B, also testified at the trial. His zero valuation was based on documentary and testimonial evidence establishing that Trans–Beacon's rights in the Bolshoi films had expired. *Id.* at 4–7; T5 at 10–12.

**5.** There is no dispute that plaintiff held the property for the requisite statutory period and is entitled to a deduction equal to the value of the property. *See* 26 U.S.C. § 170(e)(1) (1982); Pretrial Order ¶ 2. To the extent defendant belatedly raises this issue, the contention is without merit. *See* Pl.Ex. 53.

buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas.Reg. 1.170A–1(c)(2) (1988).

### A. Commercial Value

Plaintiff produced two experts on the commercial value of the Bolshoi films.[6] Jac Venza, author of the original appraisal report that formed the basis of the charitable deduction, testified that the films had a commercial value of $715,000. Venza's appraisal "presumed that somewhere in the whole international market there might be three sales at a minimum of $20,000 an hour. [He] then multiplied that by eleven hours of material, which potentially could be reorganized into programs." T1 at 26–27. In addition, Venza presumed eleven sales at $5,000 per hour in the educational market. *Id.* Plaintiff also produced Jackson Dube, an independent film distributor. Dube's valuation of "in excess of $3 million" was based on similar presumptions. Pl.Ex. 44a; T2 at 105–06. Neither Venza's nor Dube's valuation was based on "comparable sales" because, concededly, there were none. T2 at 11, 13, 20, 26; T4 at 51; Pl.Ex. 45a at 8–9.

The formulas and opinions proffered by these experts need not be followed, *Silverman v. C.I.R.*, 538 F.2d 927, 933 (2nd Cir. 1976), because they are "wholly subjective in character" and unsupported "by facts of convincing probative value." *Tripp v. C.I.R.*, 337 F.2d 432, 434 (7th Cir.1964).[7] They are based on sales and revenue projections that were not realized before or

---

**6.** The term "commercial value" refers to revenue realizable from network, syndicated and public (or noncommercial) television. It also refers to revenue realizable in the educational noncommercial market and in the international market dominated by government-owned television stations. Commercial value, as so defined, is not the same as "fair market value."

**7.** Dube's relationship with plaintiff, his limited expertise in the area, his demeanor and his preposterous valuation raise additional questions about his credibility.

after plaintiff's acquisition of the Bolshoi films and there is no evidence that any revenues were derived from commercial exploitation of the films after they were donated to the Library. Indeed, Venza, the "most active participant both in producing and buying" cultural film products such as the Bolshoi films, T1 at 28, never acquired the Bolshoi films for presentation on public television.[8]

Assuming the validity of Venza's revenue projections, a willing buyer simply would not pay $715,000 for a film product that would generate only $715,000 in revenue. At the very least, a buyer "having reasonable knowledge of relevant facts" would demand that the price paid be reduced by an amount which factored in the risks involved in purchasing and distributing the films, the costs involved in distribution, the period of time over which the revenue would be realized and some amount representing the buyer's profit.

These are not the only considerations that compel the rejection of the Venza appraisal. There is substantial credible evidence that further suggests that the Bolshoi films had little more than speculative value. Specifically, the Bolshoi films were a commercial flop from the start. *E.g.* Pl.Ex. 46, 47, 50; Def.Ex. I. While the films cost in excess of $1,200,000 to produce, there is no evidence that they ever generated more than the $95,400 in revenue received from the 1965 production of "The Best of the Bolshoi." *See* Pl.Ex. 46, 50; Def.Ex. I at 8–9. Indeed, in an act of desperation, "The Best of the Bolshoi" was offered at one point to the Ed Sullivan Show free of charge if CBS would agree to ask viewers to contribute one dollar to defray the costs of making the films. CBS declined the offer. *See* Pl.Ex. 46.

Moreover, there was also evidence that cast doubt on whether plaintiff even owned the right to exploit commercially the Bolshoi films [9] and it was conceded that neither plaintiff nor the Library made any effort to derive any commercial benefit from them. On the contrary the evidence is undisputed that the Library wanted the Bolshoi films for educational and archival purposes and that need could easily have been accommodated without granting it the commercial rights. The fact that plaintiff chose to give the Library the commercial rights, which it neither desired nor exploited, suggests his understanding of the commercial value of the films.

Finally, defendant's expert, A. Frank Reel, convincingly rebutted plaintiff's evidence of commercial value. He testified that the net revenue realizable from commercial exploitation of the Bolshoi films did not exceed $15,000. T4 at 9–117, Def.Ex. I. Reel opined that the Bolshoi films had little value in the international market. While foreign television stations were interested in obtaining cultural programming, there was sufficiently ample programming of that nature available in their own markets. The interest of foreign television stations centered on programming that they could not obtain in their own markets, e.g., action and adventure series and American feature films. Reel's testimony, and other evidence, also establishes that the Bolshoi films were of little commercial value domestically. *E.g.* T4 at 44–51; Pl.Ex. 46, 47, 50. Venza essentially conceded this when,

---

8. There is evidence that, after the gift was made, the Library broached the subject of renting or licensing the Bolshoi films to WNET. *See* Pl.Ex. 36. There was no evidence elicited regarding the outcome of those discussions.

9. While the evidence adduced at trial is insufficient to rebut the presumption of copyright ownership, Paul Sawyer testified that based on his review of documentary and testimonial evidence produced during the Trans–Beacon bankruptcy proceeding, the rights to exploit the films commercially had expired. *See* Def.Ex. B at 7; T5 at 10–12. Plaintiff's testimony about the substantial income generated from other prop-

erties in the "grab bag" confirms the legitimacy of Sawyer's concerns. T2 at 142–46. Plaintiff testified that "he did not know what [his] position was in relation" to these properties and, therefore, was unable to safely exploit these properties commercially until he acquired documentation confirming his right to do so. T4 at 143; T5 at 65–68. Plaintiff did not have such documentation with respect to the Bolshoi films and he did not know what his rights were with respect to the films. T4 at 143–45; T5 at 67, 69, 71. The absence of such documentation would clearly have had an adverse effect on commercial value.

in response to a question concerning the existence of a broadcast market for dance programming in the United States at the time of the gift, he answered, "I think there was beginning to be one." T1 at 19; *see also* Pl.Ex. 41a.

Plaintiff has not sustained his burden of proving that a willing buyer would pay a willing seller at least $715,000 for the Bolshoi films. *See, e.g., Silverman v. C.I.R.,* 538 F.2d 927, 930 (2nd Cir.1976). Setting aside any issue over the ownership of the copyright, the credible evidence establishes that the Bolshoi films had at most a nominal or speculative commercial value at the time of the donation.

### B. Archival Value

Three of plaintiff's experts testified specifically about the archival value of the Bolshoi films. Genevieve Oswald, the curator of the Dance Collection of the Library, valued Bolshoi films at $1,250,000. The figure was based on a "gut feeling of what the value of things are." T2 at 44–45.[10] Shirley Lebo, an independent appraiser who was formerly the Principal Evaluations Officer for the Library of Congress, valued the films at $950,000. She based her valuation on the cost of production at the time of the original filming. T2 at 25–27; Pl.Ex. 45a (original production cost discounted 25%). Sali Ann Kriegsman, the Director of Dance Program at the National Endowment for the Arts, "conservatively" valued the Bolshoi films at $1,250,000. Her valuation was based on what it would cost to produce four hours of programming in 1975, "plus a little bit." T1 at 56–57.

■ An expert appraiser's opinion, even if unrebutted, need not be accepted if it is contrary to the court's own judgment on value. *See, e.g., Orth v. C.I.R.,* 813 F.2d 837, 842 (7th Cir.1987); *Silverman v. C.I.R.,* 538 F.2d 927, 933 (2nd Cir.1976); *Barry v. United States,* 501 F.2d 578, 583, 584 (6th Cir.1974); *Tripp v. C.I.R.,* 337

F.2d 432, 434 (7th Cir.1964); *Kreis' Estate v. C.I.R.,* 227 F.2d 753, 755 (6th Cir.1955); *Chiu v. C.I.R.,* 84 T.C. 722, 734–35 (1985). A determination of value may instead be based on an independent analysis of all the evidence on the record. *Silverman,* 538 F.2d at 933. While plaintiff's experts are highly qualified, I do not credit their valuations of the Bolshoi films. The simple fact is that the premise that each employed in arriving at a dollar figure lacks a rational basis and the conclusions they reached are entirely speculative.

Common sense dictates that a "gut feeling," the original costs of production, or what the films would cost to produce at the time of the gift, are not relevant considerations here. There are works of art that cost very little to create for which a willing buyer would pay a great deal. On the other hand, a work of cultural significance could cost a substantial sum to produce but might not fetch anything approaching the cost of production. The cost of production (upon which the Lebo valuation is based), therefore, can hardly be a determinative factor. Moreover, when plaintiff claims that the films are "irreplaceable," i.e., not capable of reproduction, the cost of reproducing them (upon which the Kriegsman valuation is based) is simply not an appropriate measuring stick.

The only evidence regarding artistic or archival value that arguably addressed what a willing buyer would pay a willing seller was Oswald's testimony that she would "try to [and] be willing to raise the [$1,250,000] to buy [the Bolshoi films]." T2 at 53. Assuming that she could have raised the money, there is reason to doubt that Oswald would have paid plaintiff $1,250,000. First, on direct examination she said, "[w]ell, I don't know that we gave any consideration [to] purchasing [the Bolshoi films]. We were so hopeful that we would get them as a gift." T2 at 44. Second, the evidence established that, even though Oswald had been trying to obtain

---

**10.** Oswald was the only one of plaintiff's experts who did not prepare a written evaluation. She did, however, prepare a written document attesting to the importance of the Bolshoi films. The document submitted purports to "ampli[fy]

[the] previous quantitative assessments, and the commercial evaluations of the [Bolshoi films], with a qualitative analysis of the historical and teaching value of this remarkable collection." Pl.Ex. 40a; *see also* T2 at 53.

the films for at least eight years prior to plaintiff's donation, when Dube offered to transfer them to the Library (purportedly on plaintiff's behalf) on the condition that the Library pay accumulated storage charges of $3300. Oswald told him that the "suggestion that [the Library] pay the storage charges ... is a difficult problem ... which we have been unable to resolve." Def.Ex. K–P; T2 at 65–67.[11] Third, Sali Ann Kriegsman, plaintiff's own expert, testified that she did not think a willing buyer would pay $1,250,000. T1 at 57.

Plaintiff has failed to meet his burden of proving that the Bolshoi films had a value of $715,000 in the years before or after 1975. Although the Bolshoi films have some value, the standard for determining their value for tax purposes is "what a willing buyer would pay a willing seller, neither being under a compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas.Reg. 1.170A–1(c)(2). There is no evidence that a willing buyer would have paid $715,000 for the Bolshoi films in 1975.

### III

In the absence of credible testimony establishing value, the price paid by plaintiff to acquire the Bolshoi films seems to be the most rational indication of what a willing buyer would pay a willing seller. *See, e.g., Orth v. C.I.R.*, 813 F.2d 837, 841–42 (7th Cir.1987); *Anselmo v. C.I.R.*, 757 F.2d 1208, 1213 (11th Cir.1985); *Estate of Kaplin v. C.I.R.*, 748 F.2d 1109, 1111 (6th Cir.1984); *Tripp v. C.I.R.*, 337 F.2d 432, 434 (7th Cir.1964). Based on this formula, the evidence establishes that the films had a value of $66,250.00 at the time of the donation. This is the average price of the Trans–Beacon stock that plaintiff used to purchase the Bolshoi films.[12] While this figure itself may also be suspect because it was not the product of an arm's length

**11.** Oswald did eventually agree to pay accumulated storage charges of $1500, because that was what it would cost to transfer the Bolshoi films from the storage warehouse to the Library. T2 at 68–9; Def.Ex. K–R.

**12.** When plaintiff transferred the films to himself from his corporation, he paid the stock

transaction, it appears to be the most reasonable method of fixing the fair market value of the films.

The parties are directed to submit a proposed judgment reflecting the conclusions set forth above within ten days from the date of this order.

equivalent of between $33,125.00 and $99,-375.00. *See, supra,* note 3. There was no evidence that anything occurred after plaintiff acquired the Bolshoi films and prior to the donation that increased the value of the films. *See Tripp,* 337 F.2d at 434.