JAMES L. FERMAN, JR. AND CECELIA D. FERMAN, AND JOHN A. BRABSON, JR. AND MATILDA WEBB BRABSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ferman v. Commissioner
Docket No. 5631-91
United States Tax Court
T.C. Memo 1994-541; 1994 Tax Ct. Memo LEXIS 548; 68 T.C.M. (CCH) 1063; October 27, 1994, Filed *548 Decision will be entered under Rule 155. For petitioners: Andrew J. Lubrano, Phillip S. Dingle, and Martin L. Garcia. For respondent: William R. McCants. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in the 1986 Federal income tax of petitioners James L. Ferman, Jr. and Cecelia D. Ferman (the Fermans) in the amount of $ 15,640. Respondent determined a deficiency in the 1986 Federal income tax of petitioners John A. Brabson, Jr. and Matilda Webb Brabson (the Brabsons) in the amount of $ 14,585. Respondent also determined that both sets of petitioners are liable for increased interest pursuant to section 6621(c). The issues for decision are: (1) What was the fair market value of 30 silver coins contributed by the Fermans and 35 silver coins contributed by the Brabsons to the Tampa Museum? We hold that the fair market value of the 30 silver coins contributed by the Fermans is $ 8,700, and the fair market value of the 35 silver coins contributed by the Brabsons is $ 10,950. (2) What was the fair market value of one silver coin, one silver bar, and one copper ingot contributed by a partnership to the Tampa Museum? We hold *549 that the fair market value of the silver coin is $ 375, the fair market value of the silver bar is $ 16,533, and the fair market value of the copper ingot is $ 500. (3) Are the Fermans and the Brabsons liable for increased interest pursuant to section 6621(c)? We hold that they are. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT Some facts have been stipulated and are found accordingly. We incorporate by reference the stipulation of facts, supplemental stipulation of facts, and attached exhibits. The Fermans are husband and wife, as are the Brabsons. All petitioners resided in Tampa, Florida, at the time the petition in this case was filed. The Spanish galleon, the Nuestra Senora de Atocha (the Atocha), was one of a 28-ship Spanish fleet (the Tierre Del Firme fleet) that sailed from Havana, Cuba, on September 4, 1622, bound for Cadiz, Spain. The Atocha carried a cargo of gold and silver coins, gold and silver bullion, indigo, and other items. On September 5 to 6, 1622, the fleet sailed into a hurricane, and *550 eight of the 28 ships, including the Atocha, sank. The Atocha sank approximately 40 miles west of Key West, Florida. The wreck of the Atocha was located in the early 1970s by a researcher working for Treasure Salvors, Inc. (TSI). Over the next several years, TSI divers recovered various artifacts from the wreck, culminating in the discovery of the main body of the ship's treasure cargo (the mother lode) in 1985. In 1985 alone, TSI divers recovered 115,931 silver coins, 966 silver bars, 115 gold bars, 67 gold coins, 305 copper ingots, 315 uncut emeralds, and various items of jewelry, religious objects, tableware, weapons, and ship's equipment. When the wrecks of the Atocha and another Spanish galleon from the Tierre Del Firme fleet, the Santa Margarita, were located in the early 1970s, they were believed to be within the territorial waters of the State of Florida. On that basis, the State asserted that it was entitled to an interest in the property. A Division Committee was formed in 1974 to establish a system for dividing the recovered artifacts between the State and TSI. The Division Committee consisted of 16 persons: Eight represented the State of Florida, four represented *551 TSI, and four were not associated with either TSI or the State of Florida. The Division Committee developed a system (the Point System) under which points were assigned to each artifact recovered, reflecting its judgment as to the relative value of each artifact. The Division Committee did not assign dollar values to the artifacts. The share of the treasure due the State of Florida was determined on the basis of the points assigned to the artifacts. A new Division Committee met to make point evaluations for items recovered from the mother lode in 1985 and prepared a report issued around September 1986. In assigning point evaluations to silver coins, the Division Committee used four different "grades" for each category of coins. The different grades were determined by the amount of corrosion and deterioration of the coin: Grade I coins were assigned the highest point value, grade IV coins received the lowest. In 1986, petitioner James L. Ferman, Jr. (Ferman) and petitioner John A. Brabson, Jr. (Brabson) and others formed a partnership, BFK Properties (BFK), to purchase an undivided interest in salvaged treasure from the Atocha and the Santa Margarita. Ferman and Brabson each *552 bought a 25-percent profit and loss sharing and ownership of capital interest for $ 25,000. On June 16, 1986, BFK purchased, for $ 100,000, an undivided 0.125-percent interest in all treasure items recovered by TSI from the wrecks of the Atocha and Santa Margarita and a third vessel, the Marisha, between January 1, 1985, and January 1, 1988. BFK received many artifacts from the Atocha and at least one from the Santa Margarita when the treasure recovered in 1985 was distributed in 1986. BFK distributed numerous silver coins of varying grades and other items from the two wrecks to the partners. In December 1986, BFK contributed an 83-pound silver bar, a partially dated grade II silver coin, and an 11-pound copper ingot to the Tampa Museum. Of the salvaged items that the Fermans received through BFK, they contributed 30 silver coins, of which 13 had certificates of authenticity, to the Tampa Museum. The Brabsons contributed 35 silver coins, of which 17 had certificates of authenticity, to the Tampa Museum. The Fermans' lot of coins contained 10 grade I coins and 20 grade II coins. The Brabsons' lot contained 13 grade I coins and 22 grade II coins. Petitioners obtained valuations *553 for purposes of their income tax returns, as well as for their expert witness report and testimony in this case, from Robert M. Weller (Weller) in November 1986. Weller valued the 30 coins contributed by the Fermans at $ 29,800, and the 35 coins contributed by the Brabsons at $ 35,100. Weller also appraised the artifacts donated by BFK, valuing the silver coin at $ 1,500, the copper ingot at $ 900, and the silver bar at $ 53,320. On the Fermans' 1986 income tax return, they claimed a $ 29,800 deduction for their donation of the 30 silver coins and a $ 13,930 deduction as their 25-percent distributive share of the $ 55,720 ($ 1,500 + $ 900 + $ 53,320) contribution claimed by BFK on its 1986 partnership return. On the Brabsons' 1986 income tax return, they claimed a $ 35,100 deduction for their donation of the 35 silver coins and a $ 13,930 deduction as their 25-percent distributive share of BFK's charitable contribution. Respondent determined that the value of the 30 silver coins contributed by the Fermans was $ 8,600, and the value of the 35 silver coins contributed by the Brabsons was $ 10,950. Respondent determined that the combined value of the silver coin, the copper ingot, *554 and the silver bar contributed by BFK was $ 17,400. For the taxable year 1986, BFK was a small partnership within the meaning of section 6231(a)(1)(B), and thus was not subject to the unified audit and litigation procedures originally enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 402(a), 96 Stat. 648. OPINION 1. Fair Market Value of the Artifacts
The main issue for decision is the fair market value of the artifacts donated by petitioners and BFK to the Tampa Museum. Respondent's determination of the fair market value is presumed to be correct, and petitioners have the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 170(a) permits an individual to claim a deduction for charitable contributions made during the taxable year. As is the case here, if the contribution is made in property other than money, the amount of the contribution is the fair market value of the property when the contribution was made. Sec. 1.170A-1(c)(1), Income Tax Regs.
The fair market value is the price at which the property would change hands between a willing buyer and a willing *555 seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value standard applied in gift and estate taxes is applied here. Anselmo v. Commissioner, 80 T.C. 872, 881 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). The gift and estate tax regulations provide that the fair market value of an item is to be determined in the market where it is "most commonly sold to the public". Sec. 20.2031-1(b), Estate Tax Regs.; Sec. 25.2512-1, Gift Tax Regs. Fair market value of a charitable contribution is a question of fact. McGuire v. Commissioner, 44 T.C. 801, 807 (1965). Neither section 170 nor the regulations thereunder specify which market a taxpayer should use in calculating fair market value. Orth v. Commissioner, 813 F.2d 837, 841 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985). As is customary in valuation cases, petitioners *556 and respondent rely heavily on expert witness opinion to support their respective positions regarding the fair market value of the donated property. Petitioners' expert, Weller, has been actively involved in salvaging Spanish shipwrecks since 1960. Weller has not had any formal education in appraising and is not a member of any professional appraisal associations. Weller does not support himself financially as an appraiser, although he has been involved in several appraisal projects since approximately 1965. According to his own testimony, his income over the last 10 years from appraising was minimal. Since 1983, Weller has been the co-author, with Earnest Richards (Richards), of a quarterly magazine, "Plus Ultra", that discusses Spanish colonial coins. Weller is a partner with Richards in FloridaTreasure Brokers, an entity that displays and sells coins and other shipwreck artifacts at museum exhibits and gem and mineral shows. Weller has authored three books on shipwrecks. In his appraisal of the items in issue, Weller relied on what is known as the "glamour market", comprised primarily of museum and gift shop sales, where a premium is paid for the excitement and romantic *557 appeal of the artifact. He also considered the points assigned by the division committees to the various items and to similar items. Respondent's expert, John P. Huffman, was employed by the Internal Revenue Service as an appraiser from 1981 to 1990. Since 1990, he has worked for the Internal Revenue Service as an attorney. He is a fellow of the American Numismatic Society, a member of the American Numismatic Association and two local numismatic organizations, and has chaired a regional numismatic convention. He also has catalogued Atocha coins for a numismatic auction catalog. Huffman relied on the numismatic market for his appraisals, because he believed that market best meets the requirements for determining fair market value. He does not use the glamour market, because he believes that sellers in that market inflate prices to prey on unknowledgable buyers who are intrigued by the "romance" associated with salvaged treasure. a. Silver Coins Donated by the Fermans and the Brabsons
Petitioner's expert, Weller, valued the Fermans' 30 coins (the Ferman lot) at a total of $ 29,800 and the Brabsons' 35 coins (the Brabson lot) at a total of $ 35,100. Weller based his *558 appraisal of all 65 of the silver coins primarily on sales of similar coins in the gift shop operated by TSI in Key West, Florida (the TSI gift shop). He did not consider sales of silver coins by any other gift or museum shops or at auctions. It is Weller's view that sales at the TSI gift shop best reflected the value of the coins at the time they were donated to the Tampa Museum, because of the substantial amount of media attention focused on the Atocha treasure and the premium that buyers would willingly pay for the romantic appeal and glamour associated with artifacts. At the time he appraised the coins in November 1986, Weller did not have access to actual sales figures from the TSI gift shop. He was aware, however, that coins from the Atocha that had been part of a 1975 division of salvaged treasure with the State of Florida had been offered for sale by the TSI gift shop at prices ranging from $ 300 for the lowest grade coin to $ 1200 for the highest. Rarer dated coins were offered at higher prices based on the digits that were visible and the condition of the coin. Weller appraised the 65 coins individually and assigned values ranging from $ 1,500 each for two rare coins, *559 to $ 900 for the majority of the coins. Respondent's expert, Huffman, estimated the total value of the Ferman lot to be $ 8,700, and the value of the Brabson lot to be $ 10,300. Huffman inspected the Ferman lot in June 1989, but did not have an opportunity to inspect the Brabson lot. However, using the certificates of authenticity provided to respondent for 17 of the Brabson's coins, he was able to estimate their values. In arriving at the valuations, Huffman considered several auction sales of similar treasure trove material, a July 1986 appraisal by Sotheby's, Inc. of TSI property, including Atocha coins, estimates of value by several specialist dealers who have experience with comparable material, and Huffman's own experience buying both Atocha coins and other comparable coins. Huffman also considered the amount of media attention and public excitement surrounding the discovery of the Atocha treasure, but offset this by the huge quantity of Atocha coins recovered in 1985 and released into the market in the last quarter of 1986, and the lower quality of many of the Atocha coins compared to existing comparable coinage. Huffman used these factors to arrive at value ranges for *560 all the coins, depending on the grade and denomination of the coin. He estimated the total value of the Ferman lot to range from $ 5,000 to $ 8,675, and chose to round the total value at the upper range, $ 8,700, to reflect fluctuations occurring in the marketplace at the valuation date. Huffman estimated the total value of the Brabson lot to range from $ 5,950 to $ 10,250, and chose to round the total value to $ 10,300. [1]
The following table shows a summary of the opinion each expert gave at trial for the value of the silver coins: Petitioner:
Respondent:
Weller Huffman
30 silver coins (Fermans)
$ 29,800
$ 8,700
35 silver coins (Brabsons)
35,100
10,300
We previously have decided the value of Atocha artifacts that were located prior to the discovery of the mother lode and donated to the National Museum of American History in 1984. *561 Perdue v. Commissioner, T.C. Memo. 1991-478. In Perdue, the taxpayer used sales from the TSI gift shop and from "invitation-only" auctions, which the experts in that case considered to be part of the glamour market, to appraise the artifacts. We found it appropriate to consider gift shop and auction sales in deciding the value of the items involved in that case, a gold disc, a gold chain, and a gold coin, although we did not rely solely on the taxpayer's appraisals in finding the fair market value of those items. We gave the most weight to the glamour market-based appraisal in the case of the gold disc, which was one of the most rare and widely publicized artifacts from the Atocha, having been included in many exhibitions of Atocha artifacts and pictured in several publications. Because the items valued in Perdue were discovered before the mother lode was found and were largely distinctive pieces, we believe a different valuation analysis may be appropriate in the instant case. We weigh the opinions of expert witnesses according to their qualifications and other relevant evidence. Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), *562 affg. T.C. Memo. 1956-178. In the instant case, we are not convinced that Weller's appraisal, based on the prices of silver coins offered for sale in the TSI gift shop, is the best reflection of the fair market value of petitioners' silver coins. First, it is unlikely that petitioners would have had access to the TSI gift shop market, as the shop accepted very few, if any, items for consignment sale. Second, the TSI gift shop was a somewhat unusual market since it was part of the TSI museum in Key West, and the TSI museum drew thousands of visitors annually due to its close association with the recovery of the Atocha treasure. Third, while we would willingly consider glamour market data, we are concerned by Weller's failure to introduce any evidence about other gift or museum shop or auction sales of comparable coins. It is not clear that the glamour market for Atocha silver coins is represented adequately solely by the TSI gift shop. Finally, we find that the market changed somewhat, especially for silver coins, after the discovery of the mother lode in 1985. Close to 116,000 silver coins were recovered from the Atocha in 1985, and many of those *563 were distributed in 1986. Although the TSI gift shop apparently did not lower its prices with the influx of coins, there is evidence that in other, more accessible, markets the price of silver coins from the Atocha was depressed. As for Weller's qualifications, his expertise is in the area of finding and recovering sunken treasure. He was very enthusiastic about his salvage activities, but we are not persuaded that he has a great deal of expertise in valuing the artifacts he found. Huffman, on the other hand, has a great deal of experience following the market for coins in general, and the market for Spanish colonial coinage in particular. He has bought and sold coins and attends auctions regularly. He has been in regular contact with coin dealers, has done extensive research, is a member of several numismatic organizations, and demonstrated much expertise in valuing the Atocha coins. Where we find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, we may accept the opinion of an expert in its entirety. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). In this case, we *564 find Huffman to be much more persuasive than Weller. Consequently, we hold that the fair market value of the Ferman lot is $ 8,700, and the fair market value of the Brabson lot is $ 10,950. We also must ascertain the fair market value of the silver coin, the silver bar, and the copper ingot donated by BFK to the Tampa Museum. BFK claimed a charitable contribution deduction of $ 55,720 on its 1986 partnership return, of which the Fermans and the Brabsons each received 25 percent as their distributive shares. b. Silver Coin Donated by BFK
Having already analyzed the experts' valuation of the silver coins donated by the Fermans and the Brabsons, we will not review that discussion here, except to note that petitioners presented no additional evidence with respect to the BFK silver coin. Petitioners' expert, Weller, apparently valued the coin at $ 1,500 in 1986. He did not, however, discuss the coin specifically at trial and did not give an appraisal of the coin in his expert report. Although Huffman did not consider the coin to be rare, he valued the coin with some premium because the last two digits of the date of the coin are partially visible. Huffman estimated the *565 fair market value of the coin to be $ 375. We find that petitioners have not demonstrated that the fair market value of the silver coin donated by BFK was any higher than $ 375. c. Silver Bar Donated by BFK
Weller valued the 83-pound silver bar, recovered in 1985, at $ 53,320. He testified that sales of silver bars are rare and that most coin collectors would not be interested in purchasing one. Weller explained that he based his valuation on the point assignment given to three silver bars recovered from the Atocha in 1973. According to Weller, those three bars were assigned point values of 4,000 each by the Division Committee in 1975. Using 1975 point values assigned to gold coins recovered from the Atocha (100 to 150 points) and sales prices of gold coins that Weller stated were similar, although recovered from a different shipwreck ($ 1,300-$ 2,000), he arrived at value of $ 13.33 per point. Weller explained that he multiplied the $ 13.33 per point value by 4,000 points to arrive at a value of $ 53,320 for the BFK silver bar. The primary flaw we see in Weller's valuation of the silver bar is his use of the 4,000-point value. Weller testified that he saw no difference *566 in value between the three bars salvaged in 1973 and those found in 1985. We find this unpersuasive in view of the fact that one of the three silver bars found in 1973 was the artifact that was used to identify the Atocha, when it was discovered that numbers stamped on the bar corresponded with a bar of exactly the same weight listed on the manifest of the Atocha. That silver bar was the subject of widespread publicity and ultimately was sold at an auction at Christie's New York in 1988 for $ 22,000. While this auction had not occurred at the time Weller valued the silver bar in November 1986, it seems reasonable to assume that one of 966 silver bars salvaged from the Atocha in 1985 would not be worth as much as one of the most significant and widely publicized finds of 1973. This assumption is supported by the summary report of the 1985 Division Committee, which states that the 966 silver bars salvaged in 1985 were assigned a total of 814,592 points, an average of 843.26 points per bar. Weller testified that at the time he valued the silver bar, he knew of only one sale of a silver bar at auction, a 20-pound bar from a different shipwreck, that had sold for $ 6,000. He provided *567 no other comparable sales and no other support for his $ 53,320 valuation. Huffman arrived at a value of $ 16,533 for the silver bar by multiplying its basic value in silver bullion by a multiple representing its value over standard bullion. Huffman's report states that various dealers informed him that the market value of salvaged silver bars fluctuated substantially in late 1986 due to the large number of bars entering the market. Those dealers reported that sales took place at 1.75 to 3.0 times bullion value, with the lower multiples toward the end of the year. Huffman notes that one coin dealer, who specialized in coinage of the Spanish empire in the Americas, offered one of the silver bars salvaged in 1985 for sale at 3.0 times bullion in early November 1986. Analyzing auctions in the 1960s, 1970s, and 1980s, a July 1986 appraisal by Sotheby's, TSI's valuations, estimates by specialist dealers, and prices achieved in sales after 1986, Huffman determined that the appropriate multiple for the silver bar in issue was 3.0 times bullion. Thus, by multiplying the bar's weight (1002 ounces) by the approximate price of silver bullion in late 1986 ($ 5.50 per ounce), and then multiplying *568 that product (5,511) by 3.0, Huffman arrived at a value of $ 16,533. Given our concerns about Weller's chosen point value for the silver bar, the absence of any other support for the $ 53,320 valuation, and our belief that respondent has provided a reasonable basis for the $ 16,533 valuation, we will sustain respondent on this issue. d. Copper Ingot Donated by BFK
Weller valued the copper ingot donated by BFK to the Tampa Museum at $ 900. His expert report is vague as to how he arrived at this number, stating that the State of Florida assigned 2,000 points to a "grapeshot cluster" and that he valued the copper ingot to be at or near the same level of significance. Without providing a dollars per point value, Weller states that the value of the ingot is $ 900. According to Huffman's expert report, there were no comparable sales for the copper ingot. Therefore, after obtaining value estimates from specialist dealers of $ 200 to $ 500 as of the valuation date, and noting that subsequent sales by dealers have ranged from $ 200 to $ 300, Huffman estimated the value of the copper ingot to be $ 500. We find that the fair market value of the copper ingot is $ 500. 2. *569 Section 6621 Addition to Tax
Respondent determined that petitioners are liable for additional interest for substantial underpayments related to a tax-motivated transaction under section 6621(c) (formerly section 6621(d)). Section 6621(c) provides for an increase in the interest rate where there is a "substantial understatement" (an underpayment greater than $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions". Section 6621(c)(3) defines certain transactions, including a valuation overstatement, as tax-motivated transactions. A valuation overstatement occurs where the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the value or adjusted basis that is determined to be correct. Sec. 6659(c)(1). For each of the items in issue, petitioners claimed a value that was more than 150 percent of the value that we have found to be correct. Consequently, valuation overstatements have occurred. Because the amounts of both the Fermans' and the Brabsons' underpayments that are attributable to the valuation overstatements exceed $ 1,000, we hold that petitioners are liable for the increased rate of *570 interest provided by section 6621. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Although Huffman valued the Brabsons' coins at $ 10,300, which is less than the $ 10,950 respondent determined, respondent is not seeking an increased deficiency.↩