T.C. Memo. 1996-316


UNITED STATES TAX COURT


LEONARD PIPELINE CONTRACTORS, LTD., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 28985-91.              Filed July 15, 1996.


<u>Marc L. Spitzer</u> and <u>James P. Powers</u>, for petitioner.

<u>Susan E. Seabrook</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  Leonard Pipeline Contractors, Ltd. petitioned the Court to redetermine respondent's determination of an $807,983 deficiency in its income tax for its taxable year ended September 30, 1987, and additions to tax pursuant to section 6653(a)(1)(A) in the amount of $40,399 and section 6653(a)(1)(B) in the amount of 50

percent of the interest on $807,983. The deficiency is based on respondent's determination that $1,642,593 of the $1,777,800 petitioner deducted as compensation paid to its president, Richard L. Leonard, was unreasonable.

Following respondent's concession of the additions to tax, the sole issue for decision is the amount of compensation paid by petitioner that is reasonable and thus deductible as a section 162 business expense.

All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Except where indicated by the notation Can$ (standing for Canadian), all dollars are U.S. dollars.

                              FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time petitioner Leonard Pipeline Contractors, Ltd. filed its petition herein, its principal place of business was in Scottsdale, Arizona. Petitioner filed its 1987 Federal income tax return based on a fiscal year ending September 30, 1987.

Petitioner's History

Petitioner was incorporated in Canada on September 28, 1977. From its incorporation through the year in issue, petitioner engaged in pipeline construction and related activities, either

directly or through joint ventures in the United States, Canada, Saudi Arabia, and Mexico. Mr. Leonard has been petitioner's president since its inception.

Leonard Baun Holdings, Ltd. (LBH), another Canadian corporation, originally owned 51 percent of petitioner's common stock and 50 percent of its preferred stock. The remaining 49 percent of petitioner's voting stock and 50 percent of its preferred stock were owned by an unrelated publicly held company.

At the time petitioner was organized, Mr. Leonard owned 75 percent of the LBH stock and R.W. Baun owned 25 percent.[1] In October 1977, LBH sold to petitioner all of its assets (except for its participation right in three major pipeline construction contracts) for Can$6 million and its goodwill for Can$700,000.

In 1978, two additional Canadian corporations were organized, R.L. Leonard Holdings, Ltd. (RLLH) and R.L. Leonard Consultants (RLLC). Mr. Leonard owned all the stock in these corporations.

In 1979, LBH was renamed Leonard Pipeline Holdings, Ltd. (LPH). In 1983, a new Canadian corporation was formed, Leonard Pipeline Construction, Ltd. (LPC). This corporation was owned by LPH, which was owned by RLLH.

In 1984, LPH, RLLH, and RLLC consolidated. RLLH was the surviving corporation, with Mr. Leonard its sole shareholder. RLLH owned 100 percent of both LPC and petitioner.

---

[1] Mr. Baun's stock in Leonard Baun Holdings, Ltd. was redeemed in 1979.

Petitioner became a U.S. corporation on April 18, 1985,[2] by filing an application for certificate of registration and articles of continuance under Wyoming law.  These documents list Casper, Wyoming, as petitioner's corporate address.  After the application and certificate of registration were filed, all of petitioner's U.S. tax returns state a Scottsdale, Arizona, mailing address.

On January 5, 1987, Mr. Leonard incorporated Leonard Pipeline Construction Co. (LPCC), an S corporation, with petitioner consenting to the use of its corporate name.  In December 1987, petitioner merged into the S corporation.

Accordingly, during the year in issue, petitioner's sole shareholder was RLLH, whose sole shareholder was Mr. Leonard.

Petitioner's Financial Statements

Petitioner's financial statements for fiscal years 1978 through 1987 were prepared using the percentage-of-completion method of accounting for long-term construction contracts. Its income tax returns, however, were prepared on the completed-contract method. Consequently, the amounts reflected on its financial statements vary from those reflected on its income tax returns.

Petitioner reported the following amounts on its financial statements:

---

[2]     Prior to becoming a U.S. corporation, petitioner filed Forms 1120F, U.S. Income Tax Return of a Foreign Corporation.

| Fiscal Year | Assets | Gross Revenue | Gross Profit | After-tax Net Income | Dividends Paid |
|---|---|---|---|---|---|
| 1978 | $13,797,060 | $13,261,695 | $1,581,772 | $476,805 | --- |
| 1979 | 10,651,010 | 21,321,960 | 2,770,522 | 1,099,341 | $255,063 |
| 1980 | 7,367,576 | 705,640 | (1,048,785) | 298,798 | --- |
| 1981 | 13,225,920 | 40,852,715 | 4,550,930 | 1,455,211 | --- |
| 1982 | 7,015,414 | 10,244,505 | (102,826) | (489,941) | --- |
| 1983 | 5,931,770 | 1,213,983 | (232,193) | (135,116) | 631,785 |
| 1984-1986 | 3,424,358 | 8,945,181 26,019,914 | 960,902 | (859,615) | 1,082,164 |
| 1987 | 2,946,961 | 559,312 | 114,798 | (139,525) | --- |
| Total | N/A | 123,124,905 | N/A | [1]1,705,958 | 1,969,012 |

[1] The full amount of the 1987 compensation paid to Mr. Leonard, as well as the amount of the distribution of a 1985 in-kind dividend that had been treated as a loss for financial accounting purposes, have been taken into account in calculating petitioner's aggregate after-tax net income. The aggregate before-tax net income was slightly over $6 million.

Petitioner reported the following amounts on its Forms 1120F, U.S. Income Tax Return of a Foreign Corporation, for fiscal years 1979-84, and Forms 1120, U.S. Corporation Income Tax Return, for 1985-87:

| Fiscal Year | Total Assets | Gross Sales | Gross Profit | Taxable Income (after compensation deduction but before NOL and special deductions) | Dividends Paid |
|---|---|---|---|---|---|
| 1979 | $10,736,361 | $7,293,533 | $51,170 | ($2,219,417) | N/A |
| 1981 | 13,509,999 | 6,728,333 | (773,038) | (3,555,130) | N/A |
| 1982 | 7,314,042 | 43,924,265 | 7,425,068 | 5,370,502 | N/A |
| 1983 | 5,988,429 | 1,629,951 | 631,942 | 224,775 | N/A |
| 1984 | 4,881,551 | 85,160 | (261,106) | 517,618 | N/A |
| 1985 | 1,944,932 | N/A | N/A | (177,704) | N/A |
| 1986 | 3,424,362 | N/A | N/A | (141,442) | N/A |
| 1987 | 2,964,861 | 5,740,283 | 1,592,523 | 3,119,831 | N/A |

Petitioner's 1987 taxable income before the compensation deduction was $4,922,631.

Dividends

Petitioner paid RLLH a Can$743,828 dividend in 1983, and a Can$878,787 dividend in January 1985 out of petitioner's capital account. Under Canadian tax law at the time, when a dividend was paid out of a capital account, the distribution was not taxable because it represented the nontaxable portion of capital gain.

Shareholder's Equity

Petitioner reported shareholder's equity on its audited financial statements as follows:

| Fiscal Year | Shareholder's Equity |
|---|---|
| 1986 | $969,242 |
| 1987 | 1,786,314 |

We ignore earlier years due to the conversion of a portion of shareholder's equity into long-term liabilities.

Richard L. Leonard

At all relevant times, Mr. Leonard was petitioner's president, chief operating officer, and chief financial officer. Mr. Leonard has extensive experience in the pipeline industry. He began his career as a laborer at a Kansas City pipeline firm. After serving as an aviator in World War II, Mr. Leonard returned to transmission pipeline work for Midwestern Constructors in Tulsa, Oklahoma, working on major postwar projects. He held various positions for pipeline contractors in the 1950's, serving as chief inspector for Truckline Gas Co. Mr. Leonard was later appointed a superintendent by Anderson Brothers Pipeline Contractors, where he was responsible for finding and bidding on construction jobs and handling public relations work.

In 1955, Mr. Leonard moved to Canada to assume the position of general superintendent for Majestic Contractors, where he conducted all of the contract bidding and estimates. During this time, Mr. Leonard was involved in the TransCanada Pipeline, the first large diameter gas pipeline across Canada.

In 1964, Mr. Leonard became a shareholder and chief operating officer of Canadian Parkhill, Ltd. (Parkhill). During his tenure with Parkhill, the company constructed over 700 miles of pipeline across the United States and Canada.

In 1970, Mr. Leonard co-founded Joyce/Leonard Canada, Ltd. (Joyce/Leonard). He successfully negotiated a joint venture contract for the company to perform 600 miles of double jointing[3] on the Trans-Alaska pipeline project. Following this project, Joyce/Leonard was awarded contracts for pipeline construction in Australia and Indonesia. Mr. Leonard became sole owner of Joyce/Leonard in 1976 and renamed the company Leonard Pipeline Contractors, Ltd., the predecessor to petitioner.

In October 1977, Mr. Leonard secured for petitioner a joint venture contract for 750 miles of double jointing and yard coating of pipe in Saudi Arabia. In addition, Mr. Leonard facilitated the fulfillment of petitioner's contracts for the construction or reconditioning of over 600 miles of pipeline in the United States, Canada, and Mexico.

Between 1982-84, petitioner's pipeline work was slow. In early 1985, Mr. Leonard secured the All American Pipeline project for petitioner[4] wherein petitioner contracted to coat, insulate, and wrap 325 miles of pipeline in Texas, Arizona, and California.

---

[3] Mr. Leonard developed the "double-jointing" process. This process consists of cleaning and joining together two lengths of pipe using semi-automatic welding. It is done in a covered facility under controlled conditions with the joined pipes then transported to the field.

[4] Mr. Leonard ultimately pleaded guilty to a criminal information filed against him in the Southern District of Texas for obtaining the All American Pipeline contract through fraud. He was sentenced to 3 years of unsupervised probation and fined $1,000.

In February of that year, petitioner formed a joint venture with Anchor Wate Co. to perform this contract. Mr. Leonard personally guaranteed a $1.5 million debt by petitioner to the Royal Bank of Canada in connection with this project.[5]

Mr. Leonard was directly responsible for petitioner's growth and success. Over the years, despite his criminal conviction, see infra note 4, Mr. Leonard had a favorable reputation in the pipeline construction industry. Petitioner relied entirely upon Mr. Leonard (and on his personal guaranty) to obtain the necessary financial backing to participate in large pipeline construction projects.

Compensation Paid to Mr. Leonard

Petitioner contracted for Mr. Leonard's management and consulting services through RLLC for calendar years 1978-82. Pursuant to a contract between RLLC and petitioner, RLLC paid Mr. Leonard for the services that he provided to petitioner for these years. Despite this financial arrangement, Mr. Leonard considered petitioner to be his employer.

Mr. Leonard received the following amounts through the corporate entities and joint ventures with which he was involved:

---

[5]    Petitioner was not permitted to pay compensation to Mr. Leonard in 1985 and 1986 due to restrictions imposed by the Royal Bank of Canada in connection with the line of credit extended to petitioner.

| Year | Payor | Amount | |
|------|-------|--------|---|
| 1979 | Not specified | $695,176 | Can |
| 1980 | RLLC | 18,195 | Can |
| | LPH | 150,000 | Can |
| 1981 | RLLC | 18,109 | Can |
| | LPH | 50,000 | Can |
| | personal use of corporate car | 2,640 | Can |
| 1982 | RLLC | 43,228 | Can |
| 1983 | RLLC | 155,175 | Can |
| | Petitioner | 364,185 | Can |
| 1984 | Petitioner | 7,500 | Can |
| 1985 | Petitioner/Anchor Wate joint venture | 110,000 | |
| | Petitioner/Texas Coating Supply joint venture | 52,252 | |
| 1986 | Petitioner/Anchor Wate joint venture | 120,000 | |
| | Petitioner/Texas Coating Supply | 22,748 | |
| 1987 | Petitioner (bonus) | 1,680,000 | |
| | (wages) | 97,700 | |
| | Environmental Builders, Inc. | 21,000 | |
| 1988 | LPCC | 1,176,684 | |

The reasonableness of the $1,777,700 ($1,680,000 bonus plus $97,700 wages) payment to Mr. Leonard from petitioner in 1987 is at issue herein.[6]

We note that Mr. Leonard also received dividends from RLLH in 1983 and 1984 in the respective amounts of Can$500,000 and Can$200,000.

---

[6] Petitioner issued a check to Mr. Leonard on Sept. 28, 1987, and Mr. Leonard deposited it in his personal bank account. Simultaneously, Mr. Leonard transferred $289,703 of the bonus back to petitioner. While the record is unclear as to why Mr. Leonard remitted the $289,703 to petitioner, it appears he believed that he owed petitioner this amount.

Other Circumstances

Mr. Leonard had open-heart surgery in 1977 and 1980. Around 1983, he considered himself substantially retired. In 1986, Mr. Leonard's doctor recommended that he limit his work to 6-8 hours a day. In 1987, at 67 years of age, Mr. Leonard limited his work to 7-8 hours a day, 6 days a week.

In 1985, Mr. Leonard underwent a divorce. Pursuant to a February 27, 1986, temporary support order of the Superior Court of Arizona, Mr. Leonard was required to cause one of his corporations to pay his estranged wife a salary; accordingly, petitioner paid Mrs. Leonard $3,000 a month (even though she did not work for petitioner). In April 1987, the Maricopa County Superior Court entered a decree of dissolution of marriage with regard to the Leonards. Mr. Leonard and his estranged wife agreed to a property settlement divorce and separation agreement. Pursuant to this agreement, Mrs. Leonard received from Mr. Leonard money and property valued at $1,680,000. She also received a 1985 380 Mercedes Benz automobile (which had previously been owned by petitioner), as well as 1,165,000 class A shares of RLLH stock.

Following his divorce, Mr. Leonard decided to restructure his companies in light of his imminent retirement. Mr. Leonard retired in mid-1988.

William T. Perks

William T. Perks is a Canadian chartered accountant and attorney who served as Mr. Leonard's tax and legal adviser. Mr. Perks advised Mr. Leonard on the formation and reorganization of his pipeline industry entities and on subsequent transactions. Mr. Perks also worked for petitioner.

In February 1987, Mr. Leonard approached Mr. Perks about the prospect of petitioner's paying Mr. Leonard a bonus. Mr. Leonard believed that he was entitled to a bonus because: (1) The All American Pipeline project was completed and petitioner had unencumbered financial resources to compensate him and (2) petitioner's activities were going to cease shortly. Mr. Leonard also believed he should receive from petitioner an amount equal to the value of the money and property ($1,680,000) awarded to his former wife in their divorce proceedings.

In connection with Mr. Leonard's request, Mr. Perks consulted with Arthur Andersen & Co. (Arthur Andersen) in Milwaukee, Wisconsin, in May and September 1987. Arthur Andersen representatives prepared a written analysis, "R.L. Leonard-Analysis of Reasonable Compensation-LPC Ltd.'s Y/E 9/30/87." This analysis discussed nine factors relevant to whether compensation is reasonable and provided Arthur Andersen's opinion with respect to

-13-

the application of those factors to the proposed bonus.  Arthur Andersen concluded that five factors supported the reasonableness of the proposed bonus, one was undeterminable, and three contradicted the reasonableness of the proposed bonus.  Arthur Andersen recommended that petitioner document (1) that part of the bonus was payment for past services rendered to petitioner, and (2) the reasons why prior years' compensation levels were inadequate.

Board Approval of the Bonus

Petitioner's board of directors consisted of Mr. Leonard and his son.  On September 28, 1987, petitioner's board of directors held a special meeting to discuss the Arthur Andersen analysis and to determine the appropriate bonus to be paid to Mr. Leonard.  The board understood that petitioner could deduct the bonus as an expense under U.S. tax law. The board considered Mr. Leonard's service to petitioner and his prior compensation to determine the amount of the bonus.  The minutes of the board meeting (prepared by Mr. Perks) state, in pertinent part, as follows:

> 1.   The President, through his efforts as early as 1984 and resultant personal and business contacts acquired from those efforts, was able to have the corporation placed on the bidding list for All American Pipeline Company.
>
> 2.   The President[,] having acquired expertise in the coating and insulation of pipe in Saudi Arabia during 1978 through to 1980[,] was able to develop a new

insulation process starting in 1984, which process was ultimately successful in securing the All American contract (the "contract").

3. The corporation, notwithstanding the successful insulating process, would have been unable to complete the contract without the financial backing of a public corporation or a joint venture partner with financial backing. The President, through his thirty years association with the President of the Permanent Concrete Ltd., was able to secure a financially strong joint venture partner for the corporation, which partner secured for the joint venture Five Million Dollars ($5,000,000) of financing and obtained approximately Twenty-Three Million Dollars ($23,000,000) of bonding. This was accomplished without giving up more than fifty percent of the participation which would have otherwise been the case.

4. The President personally guaranteed the corporation's share of the bank financing and indemnified the joint venture partner, Anchor Wate, a subsidiary of Permanent Concrete Ltd., in respect of the bonding and further pledged his assets in support of the guarantee.

5. The President has received no compensation from the corporation for 1985 and 1986. In addition, the corporation was unable to pay compensation to its President in those years due to Royal Bank of Canada credit line restrictions, which credit line was also personally guaranteed by him. Not until now, with the contract completed and the benefits from subsequent grading and fencing contracts awarded being realized, is the corporation in a position to adequately compensate its President for his unique and extremely profitable contribution to the corporation.

Accordingly, the board unanimously agreed to pay Mr. Leonard a $1,680,000 bonus.

Notice of Deficiency

Respondent determined in the notice of deficiency that only $135,207 of the $1,777,800 compensation (bonus and wages) that petitioner paid Mr. Leonard in 1987 was reasonable. Accordingly, the notice of deficiency disallows the remainder of petitioner's claimed deduction for Mr. Leonard's compensation.

OPINION

Section 162(a)(1) permits a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as an ordinary and necessary business expense. Compensation payments are deductible under section 162(a)(1) if they are reasonable, and paid "purely for services" rendered to the business. Sec. 1.162-7(a), Income Tax Regs. More specifically, bonuses paid to employees are deductible only when made in good faith and as additional compensation for services actually rendered by the employees, provided that when added to the salaries, they do not exceed reasonable compensation for the services rendered. Rapco, Inc. v. Commissioner, T.C. Memo. 1995-128, affd. 85 F.3d 950 (2d Cir. 1996); sec. 1.162-9, Income Tax Regs. Courts generally focus on the reasonableness requirement. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.

Whether an expenditure that is claimed as a section 162(a)(1) deduction is reasonable is a factual question that must be decided considering all the facts and circumstances. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). Petitioner bears the burden to show that it is entitled to a compensation deduction larger than that allowed by respondent. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 361 (9th Cir. 1974), affg. T.C. Memo. 1971-200. Should petitioner prove respondent's determination incorrect, then we must decide the proper amount of reasonable compensation based upon the entire record. Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975).

Courts consider numerous factors when determining the reasonableness of compensation. The U.S. Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie, uses the five-factor test enumerated in Elliotts, Inc. v. Commissioner, supra at 1245-1248: (1) The employee's role in the company; (2) a comparison of the compensation paid to the employee with the compensation paid to similarly situated employees in similar companies; (3) the character and condition of the company; (4)

whether a conflict of interest exists that might permit the company to disguise dividend payments as deductible compensation; and (5) whether the compensation was paid pursuant to a structured, formal, and consistently applied program. No single factor is dispositive. Pacific Grains, Inc. v. Commissioner, supra at 606.

Respondent essentially posits that Mr. Leonard was regularly and fully compensated through petitioner's affiliated entities for the services he performed. Mr. Leonard controlled his means of compensation, using whatever method was most tax advantageous. In fact, respondent argues, Mr. Leonard treated the various companies as his personal pocketbook. Further, petitioner declared dividends over the years, which also benefited Mr. Leonard. Respondent argues that the 1987 payment to Mr. Leonard was not intended to compensate him for personal services, but rather to remove capital from petitioner because of Mr. Leonard's imminent retirement.

Respondent thus argues that the $1,777,800 petitioner deducted as compensation for its fiscal year 1987 is not reasonable and that Mr. Leonard was not undercompensated in prior years. Respondent contends (at trial and on brief) that petitioner is not entitled to deduct more than $160,710 as total compensation for 1987. However, respondent alternatively argues that should the Court determine that Mr. Leonard was also entitled to a retirement benefit, then

petitioner would be entitled to deduct up to $328,160 as total reasonable compensation.

Petitioner argues that it paid Mr. Leonard inadequate compensation for its first 9 years of existence. After consulting with qualified tax advisers, it decided to pay Mr. Leonard $1,777,800 in salary and bonus in 1987 as compensation for the significant services he had provided over the years. Petitioner contends that Mr. Leonard's exceptional service to petitioner justifies the amount paid.

Bearing in mind the parties' arguments, we shall analyze and apply the factors enunciated by the U.S. Court of Appeals for the Ninth Circuit in order to determine reasonable compensation for Mr. Leonard.

(1) Role in Company

The first factor focuses on the compensated employee's importance to the success of the business. Pertinent considerations include the employee's position, hours worked, duties performed, and the general importance of the employee to the company. American Foundry v. Commissioner, 536 F.2d 289, 291-292 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972). Where a large salary increase is at issue (such as here), it is useful to compare

past and present duties and salary payments.  Elliotts, Inc. v. Commissioner, supra at 1245.

Whether an employee has personally guaranteed his employer's debt is also a factor to be examined in this context.  In some instances, an employee's personal guaranty of his employer's debt may entitle the employer to compensate the employee with additional salary.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 n.33 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6; BOCA Constr. Inc. v. Commissioner, T.C. Memo. 1995-5.

The history of Mr. Leonard's contributions to petitioner must be considered, rather than just his contributions during the year in issue, because the compensation petitioner paid to Mr. Leonard during the year in issue represents, in part, an attempt to rectify prior undercompensation.  Respondent readily admits that Mr. Leonard was petitioner's key employee and the main reason for its success.  As president, he was the driving force behind the business from its inception, and his personal services were almost single-handedly responsible for its success.  Mr. Leonard  developed cost-effective methods of double jointing and coating that gave petitioner a competitive advantage in the pipeline construction industry. His contacts and experience contributed to petitioner's business by his

ability to obtain contracts from all over the world.  Mr. Leonard was dedicated to his work and essential to petitioner's business.

While Mr. Leonard was the driving force behind petitioner, he was in the process of retiring during the year in issue and reduced his workload to 7-8 hours a day, 6 days a week.  While these hours are less than he worked in previous years, Mr. Leonard's reduced workload must be balanced against his 40 years of knowledge and experience in the industry.

We are mindful that petitioner's sole activity during the year in issue was to report income, which had previously been earned, on a contract-completed basis.  However, because part of the bonus was attributable to Mr. Leonard's past services, we consider this fact unimportant.

Finally, Mr. Leonard personally guaranteed petitioner's $1.5 million debt to the Royal Bank of Canada.  While Mr. Leonard testified that guaranteeing debts was his normal method of conducting business, we believe that the personal guaranty further illustrates Mr. Leonard's importance to petitioner. See Owensby & Kritikos, Inc. v. Commissioner, supra.

This factor favors petitioner.

(2) External Comparison

This factor compares the employee's compensation with that paid by similar companies in similar industries for similar services.

Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; see sec. 1.162-7(b)(3), Income Tax Regs.

Both parties rely on expert opinions for purposes of determining external comparison. As the trier of fact, we must weigh the evidence presented by the experts in light of their demonstrated qualifications in addition to all other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). However, we are not bound by any expert opinion that is contrary to our judgment. Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may be selective in deciding to accept or reject expert opinion in its entirety, or accept selective portions of it. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Seagate Tech., Inc. v. Commissioner, 102 T.C. 149, 186 (1994). We may reach a decision based on our own analysis of all the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Respondent's expert, Emmett James Brennan III, prepared a report and testified as to compensation in corporate pay practices. Mr. Brennan is president of a compensation consulting firm who has

testified before this Court on numerous occasions. See, e.g., <u>PMT, Inc. v. Commissioner</u>, T.C. Memo. 1996-303; <u>Lumber City Corp. v. Commissioner</u>, T.C. Memo. 1996-171; <u>Pulsar Components Intl., Inc. v. Commissioner</u>, T.C. Memo. 1996-129; <u>Alondra Indus., Ltd. v. Commissioner</u>, T.C. Memo. 1996-32; <u>Guy Schoenecker, Inc. v. Commissioner</u>, T.C. Memo. 1995-539; <u>Mad Auto Wrecking, Inc. v. Commissioner</u>, T.C. Memo. 1995-153; <u>Boca Constr., Inc. v. Commissioner</u>, T.C. Memo. 1995-5; <u>L & B Pipe & Supply, Inc. v. Commissioner</u>, T.C. Memo. 1994-187; <u>Mortex Manufacturing Co. v. Commissioner</u>, T.C. Memo. 1994-110; <u>Thomas A. Curtis, M.D., Inc. v. Commissioner</u>, T.C. Memo. 1994-15; <u>Automotive Inv. Dev., Inc. v. Commissioner</u>, T.C. Memo. 1993-298; <u>Diverse Indus., Inc. v. Commissioner</u>, T.C. Memo. 1986-84; <u>Owensby & Kritikos, Inc. v. Commissioner</u>, T.C. Memo. 1985-267.

Mr. Brennan determined that $328,160 was the "highest maximum amount of total compensation for the highest-paid position that could be attributed to" Mr. Leonard for tax year ending September 30, 1987.  He further concluded that the "highest <u>average</u> amount of total compensation for the highest-paid position that could be attributable to" Mr. Leonard was $160,710.  Mr. Brennan based these conclusions on surveys of the amounts fabricated metals manufacturing companies and general construction companies (with revenues equal to petitioner's) would pay a chief executive officer. None of these industries was specifically involved in the pipeline

construction industry. Mr. Brennan computed his compensation figures based solely upon gross sales revenues.[7] His report neither included an amount representing retirement benefits for Mr. Leonard[8] nor analyzed amounts paid to Mr. Leonard in prior years.

At trial, Mr. Brennan testified that petitioner substantially underpaid Mr. Leonard prior to 1987. Mr. Brennan also admitted that providing a financial guaranty would justify Mr. Leonard's "eligibility for those highest average and highest maximum numbers" that he determined.

Petitioner relied on two pipeline industry experts, Michael Wagner and Michael Kesner. Both testified as to the unique features of the pipeline construction industry and its relatively small size.

Mr. Wagner has been employed as a senior executive officer in major Canadian pipeline construction companies and at the time of trial was an industry consultant. His testimony regarding large bonus payments was based solely upon his personal receipt of a $1,300,000 bonus from his employer, O.J. Pipelines, in 1983,[9] and was not tied to any specific formula. In Mr. Wagner's opinion, a

---

[7] The gross sales revenue figure Mr. Brennan used for petitioner was incomplete; it did not include any part of either the net income or the gross revenue from the All American contract.

[8] In the event we determine (which we do) that Mr. Leonard is entitled to a retirement benefit, Mr. Brennan would allocate $167,450 for such benefit.

[9] O.J. Pipelines' 1983 gross revenues exceeded $100 million.

reasonable range for Mr. Leonard's 1987 base salary was $180,000-$200,000; a reasonable range for his 1987 bonus was $1,200,000-$2,000,000.

Mr. Kesner is an expert specializing in compensation matters for Arthur Andersen in Chicago.[10] He concluded that Mr. Leonard's 1987 compensation was reasonable for three alternative reasons: (1) Mr. Leonard was undercompensated by $2,005,000-$2,700,000 in prior years; (2) the compensation was a deal bonus for locating and delivering profitable business opportunities; and (3) part of the bonus was a lump-sum payment in lieu of a formal retirement plan. Mr. Kesner used survey data, and assumed revenues of $40 million for each of the years.

We are unpersuaded by the analyses performed or opinions expressed by either respondent's or petitioner's experts. As in previous cases, we do not accept Mr. Brennan's conclusions because they are not based on data from businesses that are sufficiently similar to petitioner's or that have the significant characteristics of a specialized industry. Messrs. Wagner and Kesner were also unconvincing because they were not objective and simply promoted petitioner's position. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We do not accept their conclusions.

---

[10] Mr. Kesner was not involved in Arthur Andersen's 1987 advice to Mr. Perks and petitioner.

(3)  Character and Condition of Company

The next factor considers the company's character and condition. Relevant considerations are the company's size as measured by its sales, net income, or capital value; the complexities of the business; and general economic conditions. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; see E. Wagner & Son, Inc. v. Commissioner, 93 F.2d 816, 819 (9th Cir. 1937).

Petitioner, a relatively large company, was engaged in the highly specialized pipeline construction business. The pipeline construction industry is noted for periods of growth and subsequent decline.  Mr. Leonard's double-jointing process, which was a unique method at the time, helped promote petitioner's business. Petitioner's income stream was dependent upon Mr. Leonard's ability to successfully bid and perform lucrative contracts.

The ratio of Mr. Leonard's 1987 bonus to gross sales for that year is 29 percent ($1,680,000 divided by $5,740,283).  The ratio of Mr. Leonard's 1987 bonus to petitioner's taxable income before the compensation deduction is 34 percent ($1,680,000 divided by $4,922,631). These percentages are reasonable in light of Mr. Leonard's work for petitioner over the years as well as the prior years' undercompensation.

This factor favors petitioner.

## (4)  Conflict of Interest

The next factor considers potential conflicts of interest. This factor examines whether a relationship exists between the company and employee that might permit the company to disguise nondeductible corporate distributions as section 162(a)(1) deductible compensation.  We must closely scrutinize cases where the paying corporation is controlled by the compensated employee. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1322-1324; Elliotts, Inc. v. Commissioner, supra at 1246-1247.  However, "the mere existence of such a relationship * * * when coupled with an absence of dividend payments, does not necessarily lead to the conclusion that the amount of compensation is unreasonably high." Id. at 1246.  We adopt the perspective of an independent investor to determine whether the investor would be satisfied with the company's return on equity after the compensation at issue was paid. Id. at 1247.  Return on equity is calculated by dividing taxable income before net operating losses by the shareholder's equity.  Id. at 1245, 1247.

Mr. Leonard was not a direct shareholder of petitioner; rather, he indirectly owned all of petitioner's stock by virtue of his ownership of RLLH.  Thus, this is a scenario that we must closely scrutinize for the effects of a conflict of interest.

While petitioner declared dividends to RLLH in 1983 and 1985, petitioner neither directly paid dividends to Mr. Leonard nor paid dividends during the year in issue. Petitioner's compensation scheme was bonus-heavy and salary-light, which may suggest masked dividends. See Rapco, Inc. v. Commissioner, 85 F.3d at ___ .

However, in evaluating the compensation payment from the perspective of a hypothetical investor, we divide taxable income before net operating losses by the shareholder's equity for each fiscal year:

| Fiscal Year | Taxable Income Before NOL's | Shareholder's Equity | Return on Investment |
|---|---|---|---|
| 1986 | ($141,442) | $969,242 | -15% |
| 1987 | 3,119,831 | 1,786,314 | 175% |

Petitioner's rate of return for 1987 would surely satisfy a hypothetical investor. See Elliotts, Inc. v. Commissioner, supra at 1247 (an average return on equity of 20 percent would satisfy an independent investor).

The evidence bearing on this factor weighs in both directions. Petitioner did not declare dividends in 1987, and Mr. Leonard's compensation was bonus-heavy and salary-light. On the other hand, a hypothetical investor would be satisfied with the annual 1987 return. We thus consider this factor neutral.

(5) Internal Consistency

The final factor focuses on whether the compensation was paid pursuant to a structured, formal, and consistently applied program. Bonuses not paid pursuant to such plans are suspect. Id.

The record does not indicate that petitioner determined Mr. Leonard's bonus based on any consistently applied formula or plan. Neither is there information in the record regarding petitioner's other employees.

It is, however, permissible to pay and deduct compensation for services performed in prior years. See Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119-120 (1930); American Foundry v. Commissioner, 59 T.C. at 239. Petitioner did not compensate Mr. Leonard during 1985 and 1986 for two reasons. First, the pipeline construction industry is volatile, and petitioner's earning history reflects the classic cycle of boom and bust. Petitioner was unable to pay Mr. Leonard a bonus prior to 1987 because of economic instability. Secondly, petitioner's board of directors determined that the restrictions placed by the Royal Bank of Canada prohibited petitioner from compensating Mr. Leonard during these years. In 1987, the board concluded that petitioner benefited from Mr. Leonard's securing the right to bid on and participate in large pipeline construction projects, as well as his expertise and reputation in the coating and insulation of pipe. While we are mindful that petitioner's board consisted only of Mr. Leonard and his son, we nonetheless believe (and thus hold) that petitioner's 1987 compensation to Mr. Leonard represented, in part, an attempt to rectify his 1985 and 1986 undercompensation,[11] see Lucas v. Ox Fibre Brush Co., supra, and in

---

[11] The fact that Mr. Leonard was compensated by the petitioner-Anchor Wate joint venture in 1985 and 1986 does not
(continued...)

part, an attempt to recoup from petitioner part of the payments Mr. Leonard had made pursuant to his divorce settlement.

We are also mindful that high compensation is more reasonable when there is a corresponding lack of fringe benefits such as pension plans or stock options which might normally be expected. Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407. In these situations, an employer may pay more compensation than it would have paid had it offered a pension or profit sharing plan. Petitioner did not have any type of retirement plan.

Here, on the one hand there was no formal, consistent compensation program, and the 1987 bonus was partially an attempt to recoup from petitioner part of the payments Mr. Leonard had made pursuant to his divorce settlement; on the other hand, the compensation was paid, in part, to correct prior undercompensation and to rectify the absence of a pension plan. Accordingly, this factor is neutral.

Amount of Reasonable Compensation

Having thoroughly considered the evidence, and in light of the factors enunciated by the U.S. Court of Appeals for the Ninth Circuit, we conclude that petitioner paid excessive compensation to Mr. Leonard in fiscal year 1987. However, in light of the value of

[11](...continued)
change this conclusion.

Mr. Leonard's services, we are persuaded that petitioner is entitled to a greater compensation deduction than that allowed by respondent.

Any attempt to determine reasonable compensation with mathematical precision is impossible. See, e.g., <u>Jones Bros. Bakery v. United States</u>, 188 Ct. Cl. 226, 245, 411 F.2d 1282, 1294 (1969). Using our best judgment, we conclude that $700,000 would represent a reasonable amount of compensation to Mr. Leonard for 1987. The $700,000 amount represents $300,000 as a lump-sum retirement payment and $400,000 for salary and bonus. See <u>Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner</u>, 61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975); see also <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930).

To reflect concessions and the foregoing,

<u>Decision will be entered under Rule 155</u>.